Good morning, Your Honors, and may it please the Court. Peter Amforsiabi on behalf of Appellant Bentura. Your Honor, Your Honors, this Court should reverse because there are four separate reasons why the grant of summary judgment on the defendant's DMCA affirmative defense was wrong. Could you keep your voice up, counsel? We're having some difficult, I'm having some difficult to hear you. Certainly, Your Honor. So the four different bases under the DMCA upon which summary judgment was granted all have genuine issues of material fact on their affirmative defense. The first one is whether they adopted and reasonably implemented a policy for terminating repeat infringers. There is an absolute issue of fact here such that the Court cannot grant summary judgment. What is the issue of fact in your view? So there are about three issues of fact on both adoption and reasonably implemented. On the adoption, the issue of fact is whether they ever even adopted a policy at all. Expert Lane's unrebutted expert testimony was that the reality of their various incanted policies that were shifting throughout the depositions were themselves a pretext. They were a fiction and the reality, and this is what he said at paragraph 118 of his declaration on page 1910 of the excerpts, is that the policy was really to protect high volume uploaders. That's an undisputed assertion from an expert. When you get into the specifics of it, you see that their first policy was that we terminate people if we get repeat notices. When they were shown evidence of someone with repeat notices, the explanation was, oh, well, the general, they were very successful, something like a 99% rate of removing people who repeatedly violated copyright. Well, Your Honor, I don't think it showed that. What it showed as to my client's content specifically is that the repeat infringers, six of the eight who had previously infringed before they ever even trammeled over my client's content, were not terminated even a year into this litigation. Let me, I guess it depends some on what number you look at. There were some repeat infringers, most of whose uploaded content, the overwhelming percentage of their uploaded content, was not followed by any copyright claim from anyone. So you could have someone who supplied 99% of the content to Motherless and infringed more than anyone else because they were the biggest supplier of content, yet had very few notices of infringement. So they might, but even if they had a tiny percentage of notices of infringement, it could be a high percentage of the total notices of infringement. And if they were terminated after getting a substantial number of notices of infringement, then that would be compliance in terms of the arithmetic of it. Well, Your Honor, I don't think it's a case here. No, it's not. And it's not a mathematical test such that you can say a company that has created an infringement machine with anonymity and encourages people to mass upload, to then turn around and say, well, they uploaded 300,000 pieces of content in a year where the undisputed facts are, they know 90% of it is infringing I don't know how they know that 90% is infringing. Well, that's the expert's analysis, Your Honor. The expert was unrebutted at summary judgment who said on a statistically relevant sampling of the content on the website, 66% of it had watermarks or titles, which is indicia of obvious copyright ownership. No, it isn't. A watermark or a title, if the watermark was a copyright notice, then it would be. But as I understand it, the watermarks were by and large not copyright notices. Well, you're correct, Your Honor, about them not being a C with a date next to it. But that doesn't mean that a watermark is not indicia of ownership. A watermark shows the name of the owner, the title, the trademark holder, and that that is professionally produced content and they have no license deals with anyone. I can put watermarks on things. I can put watermarks on pictures and I can and do put titles on pictures. I don't understand why it shows that. Well, because it's, for example, if there's a little Playboy bunny, that's a watermark. Or if there's a little Ventura Content Limited, Pink Visual, those are watermarks that connote someone owns that content. It wasn't just Joe Q. Public uploading a random video of him or herself. That's not what the content is. And that's undisputed that 66% of it was so marked. How do I know it's not Joe Q. Public or Joan and Jane Q. Public uploading content of theirs? Expert Lane's analysis says the same thing, Your Honor, and it was undisputed. And that is that the people of America, the reality of the adult content industry, is that the people of America are not filming themselves at this level having sex and uploading. I guess that was really the nub of your argument, and I just couldn't see it. I mean, the rest of the theater industry is just jam-packed with people producing free photographs in the hopes that somebody will take them up as a stock photo agent. People produce and off-Broadway theater industry in New York consists of a whole lot of people living poor and putting on plays for nothing and not getting paid in the hopes that somebody will notice them and hire them. Some people enjoy the notoriety of being seen. YouTube content depends a great deal on that. Some of us might regard what we see on YouTube as embarrassing, and I don't understand why that follows, that if people are putting themselves up, somebody else must have produced it and be marketing it for profit. It follows because there's no evidence in the record that the content on their website is sort of self-filmed amateur content for which the owner is the person who uploaded it. There's simply no evidence of it. The evidence is to the contrary. Their site professes to be a place, a tube site, that's the housing of ripped porn. They scour the Internet themselves to find content to upload, and as the expert said, beyond the 66%, the other 20% that would have been known to Mr. Lange, and this is at paragraph 123 of Lane's declaration, is that it's obviously professionally produced, as he would know. Obviously, and when I hear the word obviously, what it means to me is it's missing an argument. I mean, it isn't obviously. There are such good cameras that people's videos of their grandchildren running around, the little babies running around on the rug look professionally produced because the cameras are so good. There's no evidence in the record for that conclusion, Your Honor, and the evidence in the record is that obviously isn't an argument, it's a fact. At paragraph 123, Lane said Mr. Lange and Motherless had to know that this was professionally produced content, given their existence in this industry, and the fact that he is in this industry, based upon the number of actors, the number of cameras, the lighting, and everything, he knew, and that's an unrebutted fact. It just, I mean, it's sort of, it is what it is in the summary judgment record. They didn't challenge that, and so whatever may happen on YouTube. I don't see why professional production is particularly substantial evidence of copyright violation. Let me give you a hypothetical that's on my mind, so you can show me why it's not the right one to use. Bands. So many people organize bands, and so many people perform at high schools, at bars, at charity events, all kinds of things with their bands, hoping to get picked up for some paying gigs. Meanwhile, they perform for nothing. Sometimes they have a tip jar. Sometimes they have a friend who's good with a video camera and makes a video of them and puts it up on YouTube. It looks professionally produced, because it is professionally produced. Any aspiring actor or actress gets head shots that are professionally produced, and they put them up anywhere that they can get them up in hopes of being seen. It doesn't follow that any of it's copyrighted. They want the stuff distributed as much as possible. Well, Your Honor, the difference is, it is all copyrighted, and there's no evidence of those. Why not just put the little C in the circle, copyright, and the name of the owner? That's the traditional way you protect stuff. The law doesn't require that you even put the C in there, Your Honor. No, it doesn't require it, but if you want to know whether something's copyrighted, you'll look for it. Well, Your Honor, and exactly, and if they look at every piece of content, 66% have watermarks. But they don't see that watermark. There's no evidence they didn't see the watermarks at all. The definitive copyright watermark. Oh, they don't see the word copyright. Because it's not there. Nobody puts up a C, copyright, vivid pictures, or whatever it was, and the name. That's correct. That wasn't on there. But that doesn't defeat the level of their knowledge, or the fact that once imbued with that knowledge, that they didn't take down the content. And their policy, Your Honor, shifts. I mean, part of the problem is... Knowledge of what? Knowledge of professional production, or knowledge that it's copyrighted? Knowledge that it's copyrighted. Because professionally produced content, as Lane said, obviously is owned by the copyright creator, the people who created it, and they don't have license for it. Okay, I guess I understand your argument now, and we just fall apart on the word obviously. Well, I can take out the word obviously. Let me ask you, counsel, as to the record of the evidence that the district court looked at. I mean, it's not just pointing to one issue of disputed fact, one user who wasn't terminated properly. It's basically coming forth with enough evidence to create a material issue of fact, and the district court didn't find that it was there, because there was a policy in place that users were notified. That policy had resulted in the termination of, I think, 1,500, 1,600 offending users. And so you've got to then come forward with evidence of how many people during this time were offending users such that it deserves to go to trial, essentially. It's enough to put before the jury. And as I read the record, there weren't any more than a handful, maybe two, three isolated instances. Is that not correct? And if you could come up with more than just a handful of people, if you could point me to the portion of the record that demonstrates that. Sure. Six of the eight people who infringed just my client's content had received prior takedown notices, compliant DMCA ones and noncompliant, but also compliant, were not terminated. Even after my client filed suit, now identifying them again as infringers of my client's content, for one year into this case, they still were not terminated. Those six are at volume 10 of the excerpts of record, and they're the undisputed facts, numbers 284 to 290. Six of them had multiple prior takedown notices. And these are just the eight people who infringed my client's content. Compliant takedown notices? Sorry, Your Honor? Compliant takedown notices? Yes. Six of the eight were subject of compliant takedown notices, as well as takedown notices that were not compliant, but also absolute compliant takedown notices. And so what... How soon were those removed? The users were not removed even a year into the litigation. How soon were the pictures removed? Well, they were, by the defendants, when they received notice, they removed the pictures. But they didn't terminate the users. They removed the pictures immediately. Correct. The users who had loaded a whole lot of stuff where there were no notices, and a few things where there were notices, the users, some users stayed, but the pictures were removed. Correct. The users were not terminated. That's correct, Your Honor. And that's the problem. You have to terminate repeated... The pictures were. Sorry? The pictures were. And what you're saying is that if a user has uploaded several noncompliant pictures, the duty, in order to get the safe harbor, requires removal of the user and not just the pictures. Absolutely. That's required by 512-I, Your Honor. You have to terminate the user. And so... So that's the best that you have. And that's fantastic evidence we submit, because what you're talking about is just the users on my client's content. So the narrative one would have to adopt to say that that evidence is not material is just that six of eight are aberrational, and that the rest, they're sort of doing an incredible job. It just so happened on the eight users that infringed my client's content, six of the eight weren't terminated. There's no evidence to support the idea that that six of eight is some aberration. And in addition, on the adoption, which is a separate issue, what was the evidence regarding the adoption of a removal policy? The evidence is they never adopted a policy. They had shifting stories of what their policy was. The expert concluded that their policy ultimately is intentionally vague to encourage mass uploaders. So they have shifting policies. The first policy was if a user infringes repeatedly, we terminate. When shown evidence that that wasn't true, they said, OK, there's a software glitch. When the deposition of the software person was taken, he said, we don't have software to do this. The owner of the company then dissembled again and said, OK, well, I don't know why I said that. The policy is actually I figure it out in my heart and mind as to whether the user is intending to infringe. The court can't conclude that a company can have a reasonable DMCA policy based around whether the person running the company figures out in his mind what's in the heart and mind of the actual user. That's not a policy for terminating a repeat infringer. That's a policy to encourage the mass uploaders. And that's really critical to the business model, because you can get 10, 20, 30, 40, 50 takedown notices. You can take down the content. But if people are able to upload hundreds of thousands of pieces of content a year, you build the site with stolen content. You generate ad revenue. And this is all in the Lane Declaration. It's uncontroverted, your honors. The other issue I'd like to get to is that by what particular words in the statute or case are you relying on for the proposition that if a user has repeatedly uploaded copyrighted material, which itself was taken down immediately, nevertheless, the user must be barred. I think C.C. Bell at 1113 addresses the fact that if you fail to respond once with knowledge, then it's an unreasonable policy. But does it talk about the user being terminated? That's about user termination, your honor. It's on the 512i prong of this. Ellison also says if you allow notices of infringement to fall into a vacuum, then the termination policy is not properly implemented. Here, Judge, is another example of where there's an issue of fact. They claim that, look, part of our policy is when we are told by a company with a watermark, when that company comes forward and says, hey, that watermark's ours, stop doing it, we always stop on that company. But the expert found that's not true. They claim that the company CAM4 with the CAM4 watermark had given them notices and so therefore under their policy, they would no longer put up CAM4 content. But the expert found, this is paragraph 118, 113, sorry, that they still had that content up years later. Your honors, the other three prongs that are issued here, the by reason of storage or the direction of the user, and this is a very important part of the analysis because they have to hit that touchstone, too, to win. And there, UMG and VAO made clear that if you have an automated post and publish system where just the software of the company takes it, posts it on the internet, no manual review process, then you can say it's genuinely user uploaded. And this is sort of the internet equivalent to the VCR case. But there's a line and the line is... Help me a little, finding the language that you're relying on in Perfect 10 versus C.C. Bill. C.C. Bill at page 1113 says that the failure to respond once with knowledge is an unreasonable policy. But that doesn't delineate a taking down the user as opposed to taking down the infringing content. I think that's the point that you were making, that if the users aren't terminated, it robs the infringer of safe harbor protection. So do you have something that specifically supports your premise that the user has to be terminated? Well, I think it's 512I that requires the language of the statute that says... In 512I1A, it says termination in appropriate circumstances of subscribers and account holders who are repeat infringers. So that's the language, Your Honor. And I think as applied by C.C. Bill and Ellison... That would seem to invoke just the sort of judgment based on a holistic analysis that you fault the operator of this website for. Appropriate. Reasonable. It means not absolute. I think it also... Not absolute, I wouldn't have a problem. That's a judgment. It's a judgment, and it's a factual judgment, and they bear the burden of proof. And what's reasonable belongs to the jury here. I mean, I read this, and it looks to me like what it's for is for sites that are basically entertainment. If it's a piracy site, then it doesn't get the safe harbor. But if it's a site that is not just in business for piracy, but is in business as... Oh, I forget the word the internet people use, but to gather together a bunch of squibs, as we call them in law books, and every now and then something's copyrighted, so they take it out, then it's protected. That's how the statutory language looks. And that's fine, Your Honor, but that's not their business. The evidence in this record is that their business is an infringement machine. They're not a neutral passive conduit like YouTube that is just automatically posting whatever comes up and is doing its best to weed out the content. They're encouraging infringing content to be uploaded, and they're DMCA was never intended to allow. For example, Grokster, under this narrative, Grokster could simply go from being peer-to-peer software, which the Supreme Court said 9-0 was an extreme example of malfeasance under the Copyright Act. Grokster could just form a tube site and then say, hey, we're immune. We're going to do the exact same thing, but we're immune. Let's say it did. Grokster and Apster, one of these piracy sites, if they show the whole I think what you're saying is that this site is like those hypothetical sites. Absolutely it is, because as the expert said, the content is overwhelmingly infringing. Do they show the whole movie? Sometimes they have the whole movie. Sometimes it's clips of movies. And what they do is they curate the content on the site, unlike YouTube and unlike your hypotheticals where you may upload five seconds of some meaningless thing that you filmed. If the videos are too If motherless in the review process If I take a video on a digital camera of my grandchildren playing in the yard and I put it up on YouTube, not very likely, but a lot of people do that sort of thing. And I put it up on YouTube because I think it's so cute. I have a copyright. As soon as I'm the author or as soon as I created it, it's copyrighted. So an agglomerator of cute cat pictures or cute grandchild pictures or whatnot would fall within the group of people who don't get safe harbors under your analysis. Is that right? No, that's not correct, Your Honor. I think if you formed a website that said, hey, send up cute pictures of your grandkids, the people uploading them own the copyright. You would out there rewarding people with financial and virtual rewards to upload content, which you know. Okay. Anybody who loads more than a hundred cute cat pictures gets a free cat. If anyone who loads more than a thousand cute cat pictures gets ten free cats. Then I'd have a problem because I think at that point, Your Honor, with all due respect, there's no way to conclude that the uploading person is just taking pictures of their own The business is now curating and paying for it. It's a quid pro quo for content. And when you start getting massive amounts of content, it can only be the case that the person is not a legitimately licensed entity. It's not only the case, but maybe it's a fair inference that it's the case. But the problem is you're talking in absolutes and that makes it difficult for us to accept your argument because virtually nothing is absolute. Fair enough, Your Honor. I can qualify what I've said by taking away that word. On this record, that is the inference. There's nothing in this record to support the idea that large volumes of people are uploading personal videos of themselves that they own the copyright to their own acts, sexual acts to the internet. Well, that's why I was trying to focus you on reasonable implementation of the policy, right? It has to be. It's really a reasonableness and you've got, I do agree with you that when you run a site of this nature, there is a substantial risk that there will be a lot of infringing materials uploaded. Now the question is what's Motherless done about it? And as a district court, the facts of the district court relied on 99.99% of the time defendants expeditiously removed the materials identified in the notices. So your counter to that is that, okay, well, but they don't terminate users who have prior compliant takedown notices. And so in terms of identifying how many of those individuals are, I've heard six out of eight. That's compared to 1,500 plus users that have been terminated during the time that Motherless is in operation. So I think district court's job is to kind of see that and figure out whether that's sufficient to create a genuine triable issue material fact. So if you have something more that you'd like me to look at in terms of their failure to terminate users who've been the subject of prior compliant notices, you can point me to that portion of the record. But otherwise, with the district court, the way the district court analyzed it doesn't seem to be wrong to me. The evidence we have is what I've said, Your Honor, so I have nothing else to point you to. All right, counsel. Thank you. You've exceeded your time. We'll give you one minute for rebuttal. Thank you. You're from opposing counsel. Good morning, Your Honors. Good morning. May I please the court, David Richman for defendants Motherless, Inc. and Joshua Lang. The district court granted the motion for partial summary judgment because, generally speaking, it found that the plaintiff's factual assertions were not accurate, that its arguments were contrary to case law and the statute, the DMCA statute, because plaintiff didn't understand the applicable test. Counsel, you know that we review de novo here, so we can't rely on the good judgment of the district court. We have to do it ourselves. Tell me, what is the current state of the law? Let me address... Could you hear the question, please? Sorry. What is the current state of the law where the site promptly removes material when it has a proper notice that the material violates copyright but does not remove users who have, on several occasions, submitted such material? What is the law on it? My understanding of the law is twofold. First, that the website is, the service provider, is required to expeditiously delete infringing material. And second, that the website or service provider should terminate repeat infringers. Now, what law should I look at? Both. Statutory and case law for the duty to terminate the repeat infringers. With respect to the statute, it is the same section cited by Plaintiff's Counsel 512I. And with respect to case law, it would be in UMG Recordings versus Shelter Capital in YouTube. In the VEO line of cases, that is not a, in my mind, that is not an unclear legal proposition either. So you agree that it's the obligation of the operator of the website to have a procedure to terminate infringing subscribers? Repeat infringers, yes. And how are you defining repeat? There is no definition of that term in the statute. Congress has left it to the courts and operators to make that determination. And how have the courts defined repeat? The courts, for example, in the YouTube case, found that an account holder or subscriber who received three DMCA compliant takedown notices was arguably a repeat infringer. What about two? There is a court that looked at two. So what do you do with the language in Perfect 10 that says, a service provider implements a policy if it has a working notification system, a procedure for dealing with DMCA compliant notifications? How do you put that into the mix? Where does the procedure come in? And where was the procedure in this case? You have to have a procedure in order to reasonably implement it. And what was the procedure that your client had? There were multiple aspects of that procedure. It would receive a DMCA or it would receive a notice. Where on the record can we go to ascertain what the procedure was? The procedure is outlined in the ‑‑I do not have the record pages in front of me. That's a very important point. So can you describe to me what in the record sets forth the procedure of the company? The procedures are set forth in appellant's brief, second brief on the appeal. And that is ‑‑ But there must be a reference to the record if you put it in your brief. There is, and that's what I'm looking for. I just didn't have it right this second. Okay. The points in terms of the procedure are set forth on pages 31 through 35 of the second brief. And there are record sites there which are from volume 12 and are many, many pages. Okay. So I'm sure you know this record better than we do. So give me the best record site that you have that would tell us what the procedure is. There is no one record site. There is a ‑‑ there are multiple aspects of this procedure which have different record sites, but I can go through each one of these aspects and give you a site to that particular aspect. Generally, when a business has a procedure, it's written down somewhere. So are you telling me that there is no one place that the procedure is written down to satisfy the safe harbor of the DMCA? The procedure ‑‑ That's a yes or no question. It is written down. Okay. So tell me the first place it's written down in the record. There is a DMCA policy that appears on the website as a website page. So the procedure for dealing with DMCA compliant notifications is where? It appears on a page on the website. Are you talking about the terms of use that the uploaders agree to or are you talking about something else? No. It appears also in the terms of use. There's more than one location. What does it say? It says that you cannot upload illegal or infringing content and that if you do, the content will be deleted, and if you are a repeat infringer, you will be terminated. That seems like exactly the policy that Subsection I wants. And the case law has made clear that the policy ‑‑ But just articulating the policy doesn't mean you have a procedure for doing that. The case law and the statute do not require that the procedure, for example, be in writing. It doesn't require that it be set forth anywhere. I think what the law would require there is that it be real. There are all sorts of procedures that people claim to have that they don't implement, and the courts see through those in all sorts of contexts. So the policy looks fine. The question here is does the evidence establish a genuine issue of fact as to whether the ‑‑ I keep forgetting the names of these parties. Whether the website really ‑‑ Motherless. Motherless. Whether the website Motherless really does remove repeat offenders to a reasonable degree. I agree. And I'm not clear on what your answer is to the contention that there have been several repeat offenders who were spotted. They repeatedly uploaded copyrighted material, and the material was taken down, and the people that sent the offending material in were notified, but they weren't excluded. My response to that particular question, Your Honor, is that the website, well, to back up a minute, first of all, the written policy as required by the case law is set forth in more than one location by the defendant, for example, terms of use. I think we've gotten to the written policy. Second of all, the defendant testified as to what the procedure was, and there's no testimony to the contrary. And he was a little bit ‑‑ well, there is testimony to the contrary. What you've got is the owner of Motherless testified, and it was a little vague and somewhat conflicting from his testimony just what the procedure was, and then an expert witness testified for the other side saying, can't be so. Well, then the third point is that look at the actual implementation of the policy. The implementation shows that there was a policy and that there was a procedure, and that's what Judge Wilson focused on. This website received over 3,500 takedown notices over the years of its existence. As a result of those notices, 33,000 account holders were terminated, not all for copyright infringement, but for various violations of the terms of use. The percentage of termination of accounts was estimated at somewhere around 1,500. But we care about the ‑‑ for purposes of this case, we are looking at repeat infringers only. So the total number of subscribers who were terminated for reasons other than copyright infringement really doesn't inform the analysis. Well, all of the takedown notices were provided to plaintiffs in discovery. My client kept copies of all of the takedown notices. Hold on. Let's focus here on Judge Rawlinson's question. This is basically a dirty movies website, so I would imagine that the vast majority of takedown notices were for things that were too dirty or illegal, some sort of porn that motherless thought would scare away customers, whether it was legal or not, and some porn that was illegal. So the fact that there are a whole lot of takedown notices doesn't really tell you anything about the copyright infringement takedown notices. All of the notices that dealt with copyright infringement were produced to plaintiff as part of that larger group. That's what every notice was. Notwithstanding that, by the time of the motion for summary judgment, the discussion had been winnowed down to only nine members. Out of 750,000-plus members, historically, out of over 12 million files stored on the servers, this case came down to nine members. So were they nine repeat infringers? No. Judge Wilson found that... No. Of those nine members, three of them had no takedown notices, and they only came up as part of the group of nine because eight of those nine were the eight members who had uploaded the plaintiff's films. So of those eight members, three had no notices. Another three had one notice. One of them had two notices, and one of them had four notices. They focused on those eight because that's who uploaded their films. After having all of the takedown notices, they only added one other member to this discussion, and that member had three takedown notices. If there's an issue of fact regarding one member, why isn't that enough to preclude summary judgment? Because you're looking at one member out of 750,000-plus members, and the case law... Well, I think you'd have to look at one member out of whatever group of repeat offenders there are, right? So if there's 1,000 repeat offenders and all but two ended up getting terminated, then one might conclude that there was reasonable implementation despite the fact that two slipped through, right? So I think counsel said that six out of the eight infringers in this case were the subject of prior compliant notices, but they weren't terminated. So why isn't that sufficient to allow the case to go to the jury? Because the statute requires reasonable implementation. It doesn't require perfection. Well, isn't that a question of fact what's reasonable under these circumstances? That's kind of a classic question of fact. When you have cases which say that less than four, they're not even a repeat infringer, so they shouldn't even be part of the discussion. You have one member who had four and was terminated. Their complaint about that member is not that he wasn't terminated, it's that the motherless took too long to terminate him. Isn't that a question of reasonableness? I don't believe that it is when you put it into context of everything else that the defendants did. If perfection is required, then there can never be summary judgment in these cases. What's your response to the expert testimony that was offered by the other side? The expert testimony was free to be disregarded. Why is that? Pardon? Why is that? First, when you look at the size of his sample, he looked at less than 1,000 files out of 12 million files. The district court did not disregard his testimony. The district court addressed it and said that it would not follow it, that it totally disagreed with it. Did the district court say that it didn't meet Daubert's standards? I'm sorry, what? Did the district court say that the expert testimony did not meet Daubert's standards? No. I'm still trying to put together numbers here. You've got 750,000 members and 12 million files, so that gives me denominators. Now, right now I'm not asking you about people that get blasted out of motherless because they're putting up stuff that's too dirty or stuff that's illegal, like child pornography. I assume that some percentage, and I don't know what percentage, of the 750,000 members. How many of the uploaders are uploaders of copyrighted material from Ventura? How many of the uploaders are uploaders of copyrighted material from other copyright owners? After all, the fact that motherless has been pretty successful at getting rid of copyright violators who steal Ventura's stuff doesn't mean that they have an effective policy if, in fact, everybody who steals other people's copyrighted stuff is allowed to put it up on motherless. So what I want to get is some useful numerators here. How many motherless copyright violators among the users and how many other or total copyright violators among the uploaders? I can't give you the total number. That number has never been calculated. With respect to the members who uploaded Ventura content, it was eight. Eight people? Yes. Eight people uploaded copyrighted Ventura content. Correct. Thirty-three clips of 19 films. Thirty-three clips. So there was duplication. In other words, different parts of one film were uploaded. But there were 33 total clips on the website. Okay, and of those eight people who were stealing Ventura's stuff, how many got terminated? One. Because the others were not deemed to be repeat infringers? And of the seven who were not terminated, how many infringed more than once? Of the Ventura content material? Of the people that uploaded copyrighted Ventura content. I believe that that number was three or four who uploaded more than one clip. And what was the excuse or reason for not terminating those three or four who uploaded more than one clip? Because they were deemed not to be repeat infringers. Three people had never received a DMCA takedown notice. Motherless had never received a notice from them. The first notice it received was not DMCA compliant? Some did. But the case law is clear. You don't have to pay attention to noncompliant notices. What case says that you don't have to pay attention? I think they don't trigger the DMCA requirements, but I don't think the cases say you can ignore them. That case is... UMG recordings, 665 fed sub-second at 1118 UMG. I just realized, incidentally, a lot of these people that got terminated could have been terminated because their stuff wasn't dirty enough. They might be uploading cute cat pictures. Could have been multiple reasons. So really all that matters is uploading copyrighted pictures where some copyright owner says, hey, that's my picture and writes in. And 1,500 people plus were terminated for that reason. So you're relying on a district court case for the proposition that you don't, that you can ignore noncompliant DMCA? Also Viacom International, 718 fed sub-second, yes. Yeah, but those are district court cases. Of course they're not binding on us. So you don't have a circuit, a Ninth Circuit decision that says you may ignore takedown notices that are not compliant with the DMCA? No. So if I disagree with that proposition, then that would give you red flag notice. Even though it's not, it would give your client red flag notice, even though it's not compliant with the DMCA, it's still sufficient to put your client on notice that there's potential for infringing material, correct? No. Why not? Because I think the cases say that noncompliant notices can be ignored regardless of... But you just told me those are district court cases. Those aren't binding on us. If we disagree with that premise, then that may be enough to give you red flag notice. If you disagree with that premise, then yes. But the cases that, I mean the courts that have considered it have said we will ignore them for all purposes, whether it's a termination of repeat infringers or red flag notice or something else. The duty to terminate repeat offenders is triggered by notices that do substantially comply with the statute under CC Bill, isn't that right? Yes. What does a noncompliant notice look like? It is missing a piece of information that is outlined in the statute. Give me a couple of examples of what they look like. A designation of the infringing material. It may not identify the material. Somebody sends a letter, you're stealing my stuff, but they don't tell you what stuff? Right. It also has to be under penalty of perjury, so that might be left off. Not sworn. Things like that. You're stealing my movie of some particular thing, but you didn't swear to it, so I ignore the notice. Yes. The statute sets forth what a compliant notice must contain. 512C does. Remind me how long Motherless has been in business? 2008. Has anyone tried to flood Motherless with non-dirty pictures in order to take away its appeal to those who are looking for dirty pictures? Could that explain a whole lot of the takedowns? I'm sorry, could you repeat that? Well, one way to put Motherless out of business would be to flood it with cute cat pictures so that anybody who was looking for porn would not go to Motherless. Are a lot of their takedowns non-dirty pictures, so that the numbers are inflated by numbers that are irrelevant to the kind of issue here? There was no analysis done on that point, and it was not addressed in any of the papers, because a notice would apply to content, whether it's dirty or not. The issue would be, is it infringing? Whether it's an infringing cat photo or an infringing piece of pornography, the substance of the content would not determine Motherless' response. Counsel, I'm looking at UMG recording, 665-5-1118. Could you point me to the precise language that you say instructs us to ignore a non-compliant takedown notice? Sure. I believe that it is, I don't have the case in front of me, but... Well, I'm looking for the precise language that you're relying on, because you cited this case to us, so I'm looking for the language here. I have the case in front of me, and I'm just curious as to what language on that page you're relying upon. Let me look in one other location, Your Honor. Well, I'm looking at the very page that you cited. Yes, and I'm looking at the page that you cited. I mean, it was addressed in two places in the brief. Well, I'm looking at the actual case, and I'm asking you, where is the language on that page that you're relying upon that says an infringer can ignore non-compliant notices? I don't know why I cannot find it. So if that language isn't there, then would non-compliant notices be sufficient to give red flag notice to the... No, Your Honor. Why not? Because I know that that is, I've read that point too many times. Well, it seems to me if that's a very important point, you would have been able to pinpoint where it came from, but you've exceeded your time. You didn't want to address the cross-appeal issue? I'm sorry, what? You didn't want to address the cross-appeal issue at all? I'm willing to submit on the papers on the cross-appeal. All right, thank you. We'll give you one minute for rebuttal. Thank you, Your Honors. Very, very briefly in response, at a big picture, FUNG and UMG each have an anti-ostrich admonition. It's part of the case law for red flag knowledge. You simply can't bury your head in the sand. And if you are aware of facts and circumstances... That's why I asked what non-compliant notices look like. I can imagine a non-compliant notice that is utterly useless. It's just from somebody you don't know who he is, and it says you're stealing my stuff. As I understand it just from the papers and occasional stuff in this court, but mostly newspapers, people claim all the time that movies incorporated their ideas, and they think the movies violated copyright. So I don't understand how anyone has notice of anything unless you tell them with some precision what it is that you claim that they stole and where it is and how to find it and what it's stolen from. Exactly, Your Honor. And the types of reasons that DMCA notices are deemed non-compliant is the user forgets to sign on a penalty of perjury when they identified the link and the location and the explanation of the work, but they didn't put in a... It could be forgetting. That could be on purpose. It could be. It could not be, but the question is... Tax protesters do funny things with their signatures all the time. It could be, Your Honor, but we don't know one way or another. What we know is it's a fact and circumstance that gives one awareness and red flag knowledge that infringement is occurring, and here this is really important. Six of the eight users, we focused on the eight because they're the eight who infringe my client's works, and it was stunning to find that 75% of them had received compliant DMCA takedown notices. They didn't come forward in the record and say, We have X number of users who were the recipients of compliant DMCA notices, and we terminated Y percentage of them. They didn't offer that in the record. The only analysis we have is of our actual users, and so the question at summary judgment is whether we should conclude that a failure to terminate 75% of the repeat infringers just on my client's work, compliant noticed infringers, whether that's somehow the random aberration, and really for the rest of them, when they get compliant notices repeatedly, they're terminating. Somebody uploads 75,030 pictures to Motherless and gets compliant notices that three of the 75,000 clips were violations of Ventura's copyrights, and that user was not terminated because Motherless thought almost all this guy's stuff or this woman's stuff seems to be fine. We don't get any complaints about it. We get complaints about a tiny percentage of this user's stuff. No reason to terminate this user. The user's not apparently a pirate. What's wrong with that? What's wrong with that, Your Honor, is you've inverted copyright law. What you've said is unless everyone complains all the time, mass uploaders who upload 75,000 pictures who couldn't have owned, no one owns 75,000 pieces of porn content or movies. It's not possible. No one actually owns that as an individual user to upload in a single year. But they don't license from Ventura. They don't have license deals with any legitimate companies. They have zero license deals. Unlike Veo and unlike YouTube, they don't license, so it's entirely user-submitted, fully anonymous. You don't even need to register and give an email address. And so when that happens, it may be the case, it may always be the case that a small number of the 322,000 uploads that Christy7187 did, a small number triggered DMC takedowns. But you can't conclude as a matter of law at summary judgment that the inference from that is that it's no big deal. You don't need to terminate Christy because the vast majority don't trigger complaints from the actual owners. Well, we held in UMG that the burden of policing this whole system, Congress has put on the copyright owners. Well, that's not entirely accurate. The burden is twofold. Copyright owners, it's a privilege to have the safe harbor. Copyright owners can give notice, but they have to comply with the storage, the red flag knowledge, no financial benefit and ability to control in order to get that privilege. You can't be an ostrich and stick your head in the sand and turn a blind eye to what's going on the website and then say, well, they only had a few takedown notices. I mean, in UMG, this court blessed UMG's repeat terminator policy for terminating repeat violators. When the second report came in of infringement for that user, they were terminated. Here you have six of the eight who've had compliant DMC takedown notices who weren't terminated. And coincidentally, Christy7187 was the number one uploader one year. That's why Expert Lane's testimony is so important because what it shows is really it's easy to say repeat uploaders who seed the site with the content it needs have had .001% of the content complained about, and then you get away with it. Christy looks like some woman who's figured out a way to work from home by just working really hard and uploading a lot of stuff and a tiny percentage of it gets subject to takedown notices. Why is that a red flag that Christy's a pirate? Well, Christy doesn't own any of the content as he admitted it in his deposition. That's the Hoffpower deposition. So you found Christy. Yeah, the deposition's in the record. It's the Hoffpower deposition in Excerpts of Record Volume 9. He mass-uploaded content, all of which was owned by other people, and he did it with the mass-upload technology that they offer users in anonymity. He thought, if you read his deposition testimony, it's pretty remarkable, he just thought, well, you're allowed to upload whatever you want. They said it, so I'm uploading everything. He never even professed to own any of the content. It was entirely infringing content. Counsel, could you respond to opposing counsel's description of the procedure that was used by Motherless to identify, to terminate users, infringing subscribers? Yes, Your Honor. They do not have a written procedure. What's on their website is a policy for, if you want to complain about something, you can email here, and this is when we will take it down. That is not a policy for terminating repeat infringers. The most they have is some vanilla statement that tracks the law, but as implemented, as we showed at summary judgment, they don't follow any sort of a policy. It's a sort of haphazard, we say what we want when we think we want to say what we want. And that's, we outlined, we even quoted some of the deposition testimony at Block in the opening brief, and it's outlined at length. The expert even said, after reviewing their policy, and this is an expert who's worked for the Department of Justice in different states, dealing with pornography and online issues, said their policy isn't even a policy that they've implemented. There is no procedure. The procedure, and this is what Mr. Lange ultimately testified to, well, my procedure as I implement it is, I figure out whether I think the user is acting maliciously. That is not a procedure that the Ninth Circuit we submit should bless as a legitimate procedure for content companies running online service providers. If you want to get the benefit of the currency of all this content coming onto your site, then at a minimum you should act like YouTuber Veo and not be involved in the content decisions of what's going on, not previewing and selecting certain things, and not running a business with a policy that sort of turns a blind eye to mass uploaders, the mass uploaders of whom you need to get the content on your site. All right. Thank you, counsel. Thank you, Your Honor.  The case just argued is submitted for decision by the court. The next case, Liang v. Lynch, has been submitted on the brief.
judges: Kleinfeld, Rawlinson, Nguyen